BURY *v.* DETROIT UNITED RAILWAY.

1. CARRIERS—STREET RAILWAYS—INJURIES TO PASSENGERS—DE-
FECTIVE ROADBED—EVIDENCE—ADMISSIBILITY.

In an action against a street railway to recover for the neg-
ligent death of a passenger due to the car, in the vestibule
of which deceased was riding, colliding with a car on the
opposite track which became derailed, evidence that it
was the duty of the city to relay foundations for the
track and that it had refused to do so was admissible to
explain the condition of the roadbed.

2. SAME—EVIDENCE—SUFFICIENCY.

Evidence *held*, insufficient to show such a condition of the
roadbed as to warrant defendant in refusing to operate
cars because of the failure of the city to repair the foun-
dations.

3. SAME—DEFECTIVE ROADBEDS—NOTICE—LIABILITY.

While a street railway is not responsible for the condition
of its roadbed due to the failure of a city to make repairs
to the foundation it is chargeable with notice of such con-
dition, and in the operation of its cars is required to
exercise the care made necessary by conditions.

4. SAME—OPERATION OF CARS—DEGREE OF CARE REQUIRED.

The motormen of street cars approaching on opposite tracks,
on which derailments have occurred, should govern their
cars with reference to all known conditions which make
for danger for the loads carried and each observe the
other approaching car.

5. SAME—EVIDENCE—QUESTION FOR JURY.

Evidence *held*, to present a question for the jury whether
either or both cars in meeting were handled with the high
degree of care required by known conditions.

6. SAME—DERAILMENT OF CAR—NEGLIGENCE—EVIDENCE.

Derailment of a car, in and of itself, is not evidence of neg-
ligence.

7. NEGLIGENCE—RES IPSA LOQUITUR—ACCIDENTS.

The inference of negligence is not to be drawn from the
mere happening of an accident.

8. CARRIERS—STREET RAILWAYS—NEGLIGENCE—EVIDENCE.

If other circumstances, with the fact that an accident has occurred, give rise to an inference of negligence, the inference may be rebutted by showing that the appliances of a street car are in proper condition and order, and that the servants of the carrier did all that a high degree of care required in the conduct of the business.[1]

9. SAME.

Evidence *held*, to support an inference of negligence of defendant street railway.

Error to Wayne; Hosmer, J.  Submitted June 19, 1917.  (Docket No. 82.)  Decided September 27, 1917.

Case by Ludwicka Bury, administratrix of the estate of John Rusala, deceased, against the Detroit United Railway for the negligent killing of plaintiff's decedent.  Judgment for defendant.  Plaintiff brings error.  Reversed.

*John H. Dohrman* and *William K. Campbell*, for appellant.

*William G. Fitzpatrick*, for appellee.

OSTRANDER, J.  Plaintiff offered testimony tending to prove that her intestate boarded one of defendant's south-bound cars running on Oakland avenue May 5, 1914, at about 6 o'clock a. m., at the corner of Holbrook avenue, and because the car was full was invited to, and did, with three others, go into and ride in the motorman's vestibule.  Four blocks farther south, at the corner of Philadelphia avenue, a north-bound car

[1] As to presumption of negligence from injury to street car passenger, see notes in 15 L. R. A. 35; 13 L. R. A. (N. S.) 606; 29 L. R. A. (N. S.) 811.

On liability of street railway company for defects in track or street, see notes in 52 L. R. A. 448; 15 L. R. A. (N. S.) 840; 17 L. R. A. (N. S.) 758.

Generally as to applicability of rule *res ipsa loquitor* in an action for injury by a street car derailment, see note in 43 L. R. A. (N. S.) 598.

running on parallel tracks derailed and ran across the rails on which the said south-bound car was traveling, a collision resulted, many were hurt, and plaintiff's intestate died as a result of his injuries. The derailed car had nearly, if not quite, lost momentum when it was struck by the car going south, but so close were the cars together that the driver of the south-bound car had time to do little, if anything, to stop his car.

It is alleged in plaintiff's declaration to be a duty of defendant to refrain and desist from operating cars upon and along rails, tracks, and roadbed after having notice, knowledge, or information that they are not in a fit and safe condition for the passage of cars, and a breach of this duty is alleged to have occurred upon the occasion in question. It is alleged also that the cars were operated at too high a rate of speed, everything considered, and, specifically, it is alleged:

"That the said rate of speed was not only dangerous to the life and limbs of all the passengers on said car, but that said car or cars were thus carelessly, negligently, and rapidly run on and over a section of defendant's said tracks at or near the intersection of Philadelphia avenue, as aforesaid, without being under proper control, as they should have been, and over a defective and insufficient track and over defective and insufficient rails, and over rails that were depressed and lowered in places, and bulged up in others, and over rails not properly spiked to the cross-ties, by reason of all of which acts of carelessness and negligence on the part of said defendant so done and committed, and without any fault or negligence on the part of this plaintiff's decedent, a certain car of said defendant's at the time and place aforesaid, being operated in a northerly direction on the said Fourteenth avenue line, upon and along Oakland avenue as aforesaid, was by said defendant, its agents, servants, and employees, so carelessly and negligently run, propelled, operated, and managed so as to throw and precipitate

198—Mich.—29.

said car from the rails and tracks of said line, and to cause it to derail and leave the said tracks and precipitate itself with great force and violence upon and over the parallel track of said defendant's, upon said street, causing it thereby to violently collide with and strike the car upon which this plaintiff's decedent had so become a passenger, at the invitation and request of said defendant."

The testimony tends to prove that from Euclid avenue, which is farther south than Philadelphia avenue, to the northern terminus at Woodland avenue, the roadbed in Oakland avenue was in poor condition. Defendant introduced, over objection, testimony tending to prove that it was, as between defendant and the city of Detroit, the duty of the city to relay the foundations for its tracks, and maintain such foundations, and that for three successive prior years defendant had notified the city authorities that the foundation under its tracks in the vicinity was defective and requested its repair and restoration, being itself ready and willing to relay its tracks. Over this defective roadbed it was safe, so defendant's witnesses say, to operate the type of cars in use there (single-truck cars seating 28 people) at a rate of speed not exceeding 12 miles an hour—10 to 12 miles an hour. Cars had derailed on this roadbed, on both tracks, rather frequently, six or seven times from October, 1912, to May 5, 1914, and within six or eight weeks before the accident one derailed within a distance of 120 feet south of the derail in question here and on the same track. Cars of the type described run over the wavy roadbed, acquired a considerable dipping and a swaying movement. Properly handled, and it seems that they can be steadied by the proper use of air, they could be operated over this defective roadbed safely at the rate of speed above indicated.

The movement of the south-bound car on the particular occasion was described by witnesses. It left

its northern terminus at 5.55, and arrived at Philadelphia avenue and the place of collision at 5:59. It does not appear how many stops were made. It does appear that the car started with a seated load and acquired passengers as it proceeded until, when plaintiff and his companions boarded it, it was crowded, and they were taken into the front vestibule. One of its passengers estimated the speed of the car at the moment preceding the collision at 25 miles an hour. The motorman who drove it was killed.

Witnesses fixed the speed of the north-bound car, which was carrying from 80 to 100 passengers, at no more than 10 miles an hour. Another witness, however, who was on the north-bound car, testified that the speed maintained on the bad track north of Euclid avenue was the same as that maintained on the good track. There was also testimony tending to prove:

That when the north-bound car "got past Euclid the car jumped up and down." "She hit first in front and up in back, and then we stopped and ran into the other car. She made lots of noise; would go bang down there and hit the front and back."

A witness testified that at the point where the wheels of the north-bound car left the track, as indicated by the impression on the pavement, there was a broken flange on one rail of the track. A wavy condition of the rails, the rails visibly not in alignment, nor in gauge, at about the place where the car left the track, is a condition testified to by a witness who was on the north-bound car.

Testimony for defendant tended to prove that no mark on the car wheel indicated that it had been in contact with the broken lip of the rail, and that the gauge of the rails on the north-bound track was good a very short time, a few hours, after the accident, and that it had been gauged the day previous and found to be in good condition.

Plaintiff had an adverse verdict, and complains here of:

(1) The rulings admitting evidence of the relation of the defendant and the city of Detroit with respect to the laying and maintaining of the roadbed for defendant's tracks at the place in question.

(2) The charge of the court.

(3) The refusal of the court to give plaintiff's request to charge No. 2, except as modified, refusal to give plaintiff's request No. 3, refusal to give plaintiff's request No. 4, except as modified.

(4) The refusal of the court to grant plaintiff's motion for a new trial.

The requests to charge referred to are:

"(2) This duty of the defendant to plaintiff's deceased was the duty by itself and its servants to do all that a high degree of care and prudence required it to do in and about the conduct of the business. This duty, I charge you, is not discharged by the defendant company by a showing on its part that some one else not connected with the contract of safe carriage between plaintiff's deceased and the defendant was known to the defendant to be derelict in its duties (in this instance the city of Detroit), but that such duty of the defendant extended so far as to, if necessary, cease traffic over an admittedly dangerous and unsafe track.

"(3) I charge you in that regard that, if you find from the evidence in this case that the defendant knew or had notice or knowledge by the prior derailments of its cars upon that stretch of track described in the declaration as upon and along Oakland avenue, and which by the evidence in the case is claimed to have been in a general bad condition for the whole distance to Woodland avenue, then it was the duty of the defendant to have found and repaired the place where the derailment occurred and plaintiff's deceased was injured, and its failure to do so was negligence.

"(4) I charge you that it is for you to consider the testimony of the plaintiff tending to show negligence in the operation of the car, by the defendant at the point of derailment, or immediately before; the testimony of the plaintiff that a piece of the groove or lip

of the rail was broken out of the track at or near the place where the car left the track; the testimony of a varying and spreading track at this point in connection with the inference of negligence arising from the derailment itself, all of which is to be weighed by you with the testimony offered by the defendant, and your conclusion is to be arrived at from a consideration of all of this testimony."

Not all of the points which are made under these heads demand elaboration and discussion. Some of them do.

1. Fairly interpreted, the declaration alleges not only that defendant negligently operated cars over a track, the condition of which required great care to be exercised in running cars, but it alleges also, inferentially at least, that defendant is itself responsible for the condition which made extreme care necessary and which even made it the duty of defendant to cease running cars.  Unexplained, the evidence of the condition of the roadbed made a case against the defendant likely to affect a jury rather strongly.  It is true generally, *"Res inter alios acta alteri nocere non debet,"* but it happens here that the private arrangement of the city and the defendant explains just what defendant, in view of the issue tendered, had, I think, the right to have explained.  It was not error to admit the testimony, and, while I think the second request to charge might properly have been given as preferred, it was not error to say to the jury, as was said, in substance, that the evidence in the case did not show such a condition of the roadbed as would warrant the defendant in refusing to operate cars.

While it was not responsible for the condition of the roadbed, defendant was chargeable with notice of that condition, and in the operation of its cars was bound to exercise the care made necessary by conditions.  This idea was expressed in the charge when the court said:

"The duty of the defendant to the plaintiff's deceased, was a duty by itself and its servants to do all that a high degree of care and prudence required it to do in and about the conduct of the business. Now, you take that into consideration, gentlemen of the jury, with what you may find the condition of the track, and all I can say with reference to that, having a public duty to operate its road under the ordinance as given by the common council whereby the city of Detroit became responsible for the foundation, it therefore became the duty of the defendant to operate its cars at such a rate of speed as would be consistent with safety, under the existing circumstances."

But the court had already said, among other things, of defendant's duty:

"What the law requires of it is that it shall furnish such service as existing conditions will permit, according to the practices of good railroading, and that, in so far as the jury believe from the evidence it was not responsible for the conditions under which its service was rendered, it should not be accountable for the failure due solely to such conditions."

Immediately preceding this, the court had said that:

"The defendant, under the law, is not bound to furnish a perfect service, nor is it an insurer of the safety of its passengers."

Defendant consents that conditions made operation of cars in the locality relatively hazardous. It is doubtful if from the whole charge the jury would understand the rule to be that defendant's care should measure up with the conditions presented, whether defendant was or was not responsible for the conditions.

2. I have already said, in effect, that the third request to charge was rightly refused. The fourth was not refused, although not given in the form preferred.

3. This instruction was given:

"I am asked to charge you that there is no evidence in this case which would justify the jury in finding the swaying of the north-bound car at any time before the

derailment occurred was unusual in character, or was of such a nature as to be other than incidental to the operation of cars through the streets of the city, and that therefore the motorman of the south-bound car was under no obligation in any way to check or seek to control the speed of his car, because of such swaying. Well, I think, gentlemen of the jury, that is so, unless you should find that the motorman of the car, under the existing circumstances, should have seen—

"*Mr. Fitzpatrick:* Your honor recalls that the motorman of the south-bound car lost his life, he was killed, and the presumption of due care—

"*The Court:* I think that is so, gentlemen of the jury, and I therefore give it."

It is a necessary inference to be drawn from the testimony of defendant's witnesses that it was dangerous, if not reckless, conduct to drive a car over either of the tracks in either direction at a speed of 25 miles an hour. And it is obvious that the faster the south-bound car was driven the less possible would it be to stop it in a given distance. There was testimony that the car on which plaintiff's decedent was riding was driven towards the north-bound passing car at a speed of 25 miles an hour. Independent of this testimony, it is inferable that it had been run, when moving, at a considerable rate of speed. What did a high degree of care for the safety of passengers on both cars require the motormen of cars passing in this neighborhood to do? And if, as testimony tends to prove, the north-bound car, with its heavy human load, was swaying, hitting at both ends, as it teetered on its single truck, what was the obvious duty of the driver of the south-bound car as it approached and passed it? The learned trial judge had in mind, it is clear, an admonition for the jury, an admonition not given because counsel for defendant suggested an inapplicable rule, favorable, if applied, to the defendant, which the court appears to have followed.

Manifestly the true rule to be applied is that both motormen should have governed their cars with reference to all known conditions which made for danger to the loads either carried, and manifestly the duty to observe the other approaching car was imperative.

Applying the rule, it was for the jury to say whether either or both cars in meeting were handled with the high degree of care demanded by known conditions. Every day cars were safely operated over the roadbed. The track was rough and wavy, if not otherwise out of order, but, if driven slowly enough cars could safely make the journey. Speed made danger. In view of the danger of derailment of cars, the speed of either car in meeting and passing another car was matter of importance. And the court did more than once in the course of the charge advert to this fact, saying at one time:

"The defendant company was bound to operate a street railway over that track as it existed, but the question was whether they were bound—whether they should have used the speed under the circumstances they did use."

In eliminating from consideration the speed of the south-bound car, this controlling question was answered, in part and as matter of law, by the court.

Derailment of a car, in and of itself, is not evidence of negligence. *Felske* v. *Railway*, 166 Mich. 367 (130 N. W. 676); *Niedzinski* v. *Traction & Electric Co.*, 160 Mich. 517 (125 N. W. 409). The inference of negligence is not to be drawn from the mere fact of an accident. *Sewell* v. *Railway*, 158 Mich. 407 (123 N. W. 2). And if other circumstances, with the fact that an accident has occurred, give rise to an inference of negligence, the inference may be rebutted by showing appliances in proper condition and order, and that the servants of defendant did all that a high degree of care and prudence required in the

conduct of the business. *Sewell* v. *Railway, supra; Rouston* v. *Railway,* 151 Mich. 237 (115 N. W. 62); *Dolph* v. *Railway Co.,* 149 Mich. 278 (112 N. W. 981).

It is my opinion that the testimony in this case supports an inference of the negligence of defendant which is within the allegations of the declaration, and that the jury was not clearly advised about the high degree of care and prudence required of defendant's servants, and especially did not appreciate from any instruction given that the very condition of the road-bed for which the city was responsible might be found to measure the degree of care owed to plaintiff's intestate.

The judgment is reversed, and a new trial granted.

KUHN, C. J., and STONE, BIRD, MOORE, STEERE, BROOKE and FELLOWS, JJ., concurred.